IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOSEPHINE TONG                §
                              §
VS.                           §     CIVIL ACTION NO.4:03-CV-1234-Y
                              §
DIRECT TRADING CORP., et al.  §

ORDER DENYING PLAINTIFF'S MOTION TO COMPEL ARBITRATION AND
RENDERING MOOT DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

Pending before the Court is plaintiff Josephine Tong's Motion
to Compel Arbitration and Stay Proceedings [doc. # 78], filed
November 5, 2004.  Also pending before the Court is the defendants'
First Amended Motion for Preliminary Injunction [doc. # 164], filed
April 8, 2005.[1]  Having carefully reviewed the motion to compel
arbitration and its response, reply, supplemental response, sur-
reply, sur-sur-reply, and additional court-directed briefs on
choice-of-law issues, the Court concludes that Tong's motion to
compel arbitration should be DENIED.  Moreover, having so
determined, the Court further concludes that the defendants' motion
for preliminary injunction should be RENDERED MOOT.


I. BACKGROUND

Tong contends that defendants Direct Trading Corporation
("DTC"), Direct Trading Management ("DTM"), Direct Trading, GP,
Inc., and Direct Trading Institutional, Inc. ("DTI") (hereinafter,

_____

[1] The defendants amended motion for preliminary injunction amended their
March 2 motion for preliminary injunction.

collectively "the DT entities") employed Tong during 2000 and 2001 to sell and train clients in the use of computer software that facilitates the internet trading of stock and other investments. Tong asserts that defendants Allan Peterson and Mark Gulis are principals and/or alter egos of the DT entities, which she asserts sold securities through Williams Financial Group ("Williams Financial"). Williams Financial is not a party to this action.[2] Tong contends that the defendants began wrongfully withholding compensation from her in November 2000. Tong also alleges that in June 2001, she informed the defendants in writing that she believed she was being discriminated against on the basis of her gender and race; and that following this notice the defendants began to retaliate against her. Tong was discharged in July 2001.

On November 15, 2002, Tong filed suit in the Northern District of Illinois, Chicago Division, against the DT entities, Gulis, and Peterson, alleging that the defendants wrongfully withheld compensation from and discriminated against her. Tong filed a second amended complaint on July 10, 2003, in which she asserted the following claims: (1) breach of contract; (2) unjust enrichment; (3) quantum meruit; (4) violation of the Illinois Sales Representative Act; (5) violation of the Illinois Wage Payment and Collection Act; and (6) violation of 42 U.S.C. § 1981. The case

---

[2] Tong sought leave to file a third amended complaint adding Williams Financial as a defendant in the above-styled and -numbered cause. The Court denied Tong's motion on December 8, 2004.

was subsequently transferred to this Court on September 30, 2003. On October 19, 2004, DTC filed a counterclaim against Tong for fraud, breach of contract, and unjust enrichment.

Tong moves to compel arbitration on the basis of her having signed an Application for Security Industry Registration or Transfer, also known as a "Form U-4" ("the U-4"), which registered her with the National Association of Securities Dealers ("NASD").[3] The U-4 lists Williams Financial as Tong's firm and contains Tong's electronic signature.[4]  (App. to Pl.'s Mot. to Compel Arbitration at 1-11.)  The U-4 provides:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the *SROs* indicated in item 11 [NASD] as may be amended from time to time and that any arbitration awarded entered against me may be entered as a judgment in any court of competent jurisdiction.

(*Id.* at 9, ¶ 5).  The Federal Arbitration Act ("FAA") recognizes such arbitration agreements, and courts have routinely enforced arbitration provisions contained in the Form U-4.  *See* 9 U.S.C. §

---

[3] The Court notes that Tong originally also moved to compel arbitration pursuant to an Independent Contractor Agreement ("the ICA"), but has since abandoned the ICA as a basis for compulsive arbitration.  (*See* Pl.'s Additional Br. at 5-6.)

[4] Just above the signature line is the following statement:

> Applicant or applicant's agent has typed applicant's name under this section to attest to the completeness and accuracy of this record. The applicant recognizes that this typed name constitutes, in every way, use or aspect, his or her legally binding signature.

(App. to Pl.'s Mot. to Compel Arbitration at 10).  Tong's name is typed below the statement, along with the date.

3

2; *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 748 (5th Cir. 1996); *Hampton v. ITT Corp.*, 829 F. Supp. 202, 203 (S.D. Tex. 1993); *Mouton v. Metropolitan Life Ins. Co.*, 147 F.3d 453, 456 (5th Cir. 1998); *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 658-59 (5th Cir. 1995).

Tong argues that arbitration must be compelled because DTC and DTM are agents of Williams Financial and because Tong, Gulis, Peterson, and other DTC/DTM employees were registered with NASD as employees of Williams Financial.  Thus, Tong's contention is that the defendants' relationships with Williams Financial, coupled with the U-4, bind the defendants to arbitrate the present dispute.  The defendants contend that they were not parties to the arbitration agreement contained in the U-4 and that, even if they were subject to that agreement, Tong waived her right to arbitrate by initiating litigation against the defendants and allowing it to continue for over two years.

## II. ANALYSIS

### A.   Application of Basic Arbitration Principles

Courts must conduct a two-step inquiry to determine whether parties should be compelled to arbitrate a dispute.  *See OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001); *R.M. Perez & Assocs., Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992).  First, the court must decide whether the parties

agreed to arbitrate.  *See OPE Int'l LP*, 258 F.3d at 445.  "This determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement."  *OPE Int'l LP*, 258 F.3d at 445 (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996).  Second, once the court determines that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable.  *R.M. Perez & Assocs., Inc.*, 960 F.2d at 538.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960); *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002).  Although there exists a strong and long-recognized national policy favoring arbitration evinced by the FAA,[5] "there is an exception to this policy: . . . whether the parties have

---

[5] The Supreme Court has emphasized that the FAA "declared a national policy favoring arbitration," *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56 (1995), and was enacted "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Volt Info. Sciences, Inc. v. Brd. of Trustees of Leland Standford Junior Univ.*, 489 U.S. 468, 474 (1989).  Consequently, the FAA, by its terms, "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  Furthermore, with respect to arbitration clauses in the area of employment law, the Supreme Court has indicated that "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001).

submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Howsam*, 537 U.S. at 83 (quoting *AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)) (emphasis deleted) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Thus, "[the] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead 'ordinary contract principles determine who is bound.'" *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073-74 (5th Cir. 2004) (quoting *Daisy Mfg. Co., Inc., v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994)) (citation omitted). This is because "the purpose of the [FAA] is 'to make arbitration agreements as enforceable as other contracts, but not more so.'" *Fleetwood*, 280 F.3d at 1074 n.5 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)) (citing *Mitsubishi Motors Corp v. Soler Chrysler Plymouth*, 473 U.S. 614, 625-26 (1985) (citation omitted) ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered.")). Accordingly, "in determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement." *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citing *First Options*, 514 U.S. at 944).

6

The issue is more complicated in this instance, however, because the document containing the arbitration clause at issue is not a simple contract between the parties, but rather is the U-4, a securities-industry-registration application. The U-4 is governed by NASD rules: "I submit to the authority of [Illinois] and [the NASD] and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of [Illinois] and [the NASD]." (App. Pl.'s Mot. Compel Arbitration at 8, ¶ 2 (The U-4.)) To the extent that state-law interpretation of the contract is necessary, Illinois law would apply. *Alberto v. Diversified Group*, 55 F.3d 201, 203 (5th Cir. 1995) (stating that, to determine which state's choice-of-law rules apply, federal court sitting in diversity should apply the forum state's choice-of-law provisions); *Castilleja v. Camero*, 414 S.W.2d 424, 426 (Tex. 1967) ("A contract which is made in one jurisdiction but which relates to and is to be performed in another jurisdiction is governed by the law of the place of performance"); *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991) (same); *Gramercy Mills v. Wolens*, 63 F.3d 569, 573 (7th Cir. 1995) (finding that home state is place of performance even where sales are solicited outside that state). Moreover, the U-4 contractually obligates an applicant to abide by NASD's rules and NASD's Code of Arbitration Procedure ("the Code"). *See Goldberg v. Donaldson, Lufkin and Jenrette Securities*, 650 F.

Supp. 222, 225-26 (N.D. Ga. 1986); *Basil*, 1998 U.S. Dist. LEXIS 2220, at *7-8; *Hickman*, 1996 U.S. Dist. LEXIS 13196, at *7-8. Whether the defendants agreed to submit this dispute to arbitration is therefore a question primarily answered by NASD's rules.[6]   *See Howsam*, 537 U.S. at 83.

B.    Application of NASD Principles

NASD's rules constitute a contract ("the membership agreement") between NASD members.  *See Muh v. Newburger Loeb Co.*, 540 F.2d 970, 973 (9th Cir. 1976); *Basil Inv. Corp. v. Chubb Secs. Corp.*, CIVIL ACTION No. 97-1852, 1998 U.S. Dist. LEXIS 2220, at *7-8 (E.D. Pa. March 2, 1998).  The membership agreement includes the Code.  *See Gilmer*, 500 U.S. at 25; *Willis v. Dean Witter Reynolds*, 948 F.2d 305 (6th Cir. 1991); *Cullen v. Paine, Webber, Jackson & Curtis, Inc.*, 587 F. Supp. 1520 (N.D. Ga. 1984); *Legg, Mason & Co. v. Mackall & Coe, Inc.*, 351 F. Supp. 1367 (D.D.C. 1972); *Hickman v. Painewebber Inc.*, No. 1:96-CV-0273, 1996 U.S. Dist. LEXIS 13196, at *7-8 (E.D. Tex. Sept. 3, 1996).  Because the membership agreement

---

[6] The Court takes note of the defendants' argument that the FAA governs the interpretation of the U-4's arbitration clause. (Defs.' Resp. to Additional Br. at 4.)  The Court does not disagree with the defendants' argument.  The *interpretation* of the arbitration clause contained within the U-4 is entirely guided by the FAA.  *See* 9 U.S.C. §§ 1 & 2; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).  But interpreting the U-4's arbitration clause is separate from deciding whether there is between the parties a valid agreement to arbitrate.  Such a decision is lodged with the courts, and must be arrived at by applying ordinary contract principles.  *See Cal. Fina Group, Inc. v. Herrin*, 379 F.3d 311, 315-16 & n.6 (5th Cir. 2004) (interpreting NASD rules and a Form U-4) (citation omitted); *see also Howsam*, 537 U.S. at 83 (citation omitted); *Fleetwood*, 280 F.3d at 1073-74 (citation omitted).

evidences a transaction in interstate commerce, the membership agreement and the parties to it are subject to the provisions of the FAA. *See* 9 U.S.C. §§ 1 & 2; *Gilmer*, 500 U.S. at 25.

When a person registers with the NASD under Form U-4 he becomes a party to the membership agreement. *Hickman*, 1996 U.S. Dist. LEXIS 13196, at *8. NASD members as well as applicants under Form U-4 are therefore contractually obligated to abide by the Code and are further bound by the FAA. *See Goldberg v. Donaldson, Lufkin and Jenrette Securities*, 650 F. Supp. 222, 225-26 (N.D. Ga. 1986); *Basil*, 1998 U.S. Dist. LEXIS 2220, at *7-8; *Hickman*, 1996 U.S. Dist. LEXIS 13196, at *7-8. An obligation to arbitrate pursuant to Form U-4 and the Code is not extinguished upon resignation as an NASD member. *Hickman*, 1996 U.S. Dist. LEXIS 13196, at *8.

Forms U-4 are contracts between the applicant and the securities exchanges; they are not contracts between the applicant and the firm for whom the applicant will work (the member). *See Gilmer*, 500 U.S. at 25. The U-4 is therefore not a contract between Tong and Williams Financial or any of Williams Financial's agents. *See id.* It would be therefore impossible for either the defendants or Williams Financial to be parties to Tong's U-4.

The language of the arbitration clause in the U-4 bolsters this construction. The clause provides: "*I* agree to arbitrate any dispute, claim or controversy that may arise between me and my

firm, or a customer, or any other person that is required to be arbitrated . . ."  (The U-4 at 9, ¶ 5 (App. to Pl.'s Mot. to Compel Arbitration.))   The use of the pronoun "I" indicates that only those executing the form are bound by the specific arbitration clause contained therein.  As previously stated, Tong is the only signatory to the U-4 in question.  Thus, the very language of the U-4 supports the conclusion that only *Tong* can be forced to arbitrate because of the specific language contained in the U-4. Whether *the defendants* are subject to the arbitration requirements of NASD is a separate question, governed by NASD rules rather than by the terms of the U-4.  The Court must therefore look to NASD rules and the Code to determine whether the parties agreed to arbitration.  Before the Court can engage in such an analysis, however, it must first examine the defendants' relationships to each other and their classifications under NASD.

(a)  <u>Agency Principles</u>

Tong argues that the defendants are agents or alter egos of Williams Financial.   The evidence Tong relies upon for this argument, however, is weak at best, consisting of CRD reports[7] for

---

[7] CRD reports are reports obtained from NASD BrokerCheck, a public-disclosure program containing reports "derived from the Central Registration Depository (CRD) as reported on the industry registration/licensing forms--Form U-4 and Form BD."  (Pl.'s App. to Reply Br. at 23.)

DTI employees formerly associated with Williams Financial,[8] pay stubs, and a facsimile cover sheet. (Pl.'s Reply to Mot. to Compel at 2.) Moreover, Tong fails to direct the Court to the most probative pieces of evidence adduced: corporate records and business registrations for DTC and DTM the Court found by happenstance when paging through the appendix to Tong's reply brief. (Pl.'s App. to Reply to Mot. to Compel at 99-103.)

Furthermore, Tong wholly fails to adequately brief the legal predicate for establishing that the DT entities, Gulis, and/or Peterson are agents of Williams Financial. Nor does Tong supply legal citations or arguments regarding whether the DT entities are sufficiently related to one another in terms of corporate structure to be treated as one corporate entity, i.e., whether piercing the corporate veil of these entities would be appropriate. In fact, despite the numerous opportunities afforded Tong to support her motion to compel, Tong includes only two citations to legal

---

[8] Tong contends that "the salespersons of DTC and DTM were employees of Williams Financial." (Pl.'s Reply to Mot. to Compel at 2.) As support for this argument, Tong offers the CRD reports of Gulis, Peterson, and other individuals that are not defendants in this suit; all of these individuals are currently employed by DTI. (Pl.'s App. to Reply Br. at 33-88.) These CRD reports reflect that Gulis, Peterson, and other individuals worked for Williams Financial while also working for DTI; they do not reflect any employment relationship with either DTC or DTM. Therefore, the CRD reports fail to support Tong's argument because they fail to connect DTC and/or DTM with Williams Financial. Nor does Tong offer supporting evidence connecting DTI with DTC and/or DTM.

Tong also offers her own CRD report to bolster her claim that DTC and DTM employees were actually employees of Williams Financial. Tong's CRD report does not list DTC, DTM, or DTI as a former employer--in fact, it fails to indicate any association between Tong and any of the DT entities; only Williams Financial is listed as a former employer of Tong. (*Id.* at 110-121.) Tong's CRD report therefore also fails to create a nexus between DTC, DTM, or DTI and Williams Financial.

authority concerning agency principles.[9]  Tong does not indicate how this authority applies to the circumstances of her case, however.  What remains, then, is a bare-bones presentation upon which the Court may not rely.  Moreover, while it appears that Illinois law applies to the state-law issues in this case, (*see* Additional Brs.), the DT entities may be Texas entities.  (Pl.'s App. to Reply to Mot. to Compel at 99-103 (Corporate Records.))  Despite this, Tong does not provide the Court with any authority or legal arguments regarding agency principles under either Illinois or Texas law.  Tong therefore wholly fails to brief her agency arguments, and instead simply expects the Court to assume that the DT entities, Gulis, and Peterson are or were agents or alter egos of Williams Financial.  Having failed to provide the legal and factual support therefor, however, Tong cannot reasonably expect the Court to so find, conclude, or even assume.[10]

---

[9] Tong's reply brief states: "An agent of a signatory can be bound to the terms of that contract.  *See Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 5th Cir. 2003)."  (Pl.'s Reply Br. to Mot. to Compel at 2.)  It also states: "a non-signatory to a contract can be *compelled* to arbitrate by some accepted theory under agency or contract law.  *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 536 (5th Cir. 2000).  Tong never indicates what those "accepted theories" are.

[10] Furthermore, the Court notes that agency relationships can be difficult to establish when seeking to bind a defendant to an agreement to arbitrate pursuant to NASD rules.  *See Cantor Fitzgerald, L.P. v. Prebon Sec. (USA) Inc.*, 731 A.2d 823, 830 (Del. Ch. 1999) (finding that non-NASD-member plaintiff that owned a 99.5% partnership in a NASD member through which it carried out its business could not be compelled to arbitrate by a separate NASD-member defendant with whom plaintiff had business relations) (noting that defendant cited no legal authority for binding a principal to an agent's arbitration agreement where the principal was not also a party to the action).

    (b)  <u>NASD Registration and Membership: Gulis, Peterson, Williams Financial, and DTI</u>

As of September 2004, DTI was an NASD member. (Pl.'s App. to Reply Br. at 33, 45 (Gulis's CRD Report.))[11] There is no evidence in the record, however, that DTI was an NASD member either during Tong's employment with the DT entities or while Williams Financial acted as Tong's firm for purposes of Tong's NASD registration.

There is little evidence in the record concerning Williams Financial's status as an NASD member: only the U-4 itself, which merely lists Williams Financial as Tong's member firm. Nevertheless, the Court will assume that Williams Financial was a member of the NASD during the relevant time because none of the parties have contested the point and, were Williams Financial not a member, it would not have been necessary for Tong to complete a Form U-4. *See* NASD Manual Rule 1031 (2005).

Regarding Gulis and Peterson, as of September 2004 they were both registered with the NASD. (Pl.'s App. to Reply Br. at 32-48 (CRD Reports.))  It is not clear, however, whether Gulis and Peterson were registered with the NASD during the time underlying this dispute or, if they were, through which NASD member they were

---

[11]   The CRD reports adduced by Tong list a broker's current and former employers and provide a "CRD Number" only for current employers (or firms) registered with NASD. (Pl.'s App. to Reply Br. at 32-33.)  Gulis's and Peterson's CRD reports both indicate that DTI is their current employer (as of September 2004) and provide a CRD number for DTI. (*Id.* at 33, 45.)  Since CRD numbers are only provided for current employers who are NASD firms, the presence of a CRD number for DTI indicates that DTI is (or, as of September 2004, was) an NASD member.

registered.  (*Id.*)  Gulis's and Peterson's CRD reports do not include CRD numbers for Williams Financial.[12]  (*Id.* at 35, 47.)  The absence of a CRD number from Williams Financial's listings on these reports could indicate that either: (1) Gulis and Peterson registered with NASD and listed Williams Financial as their member firm but that the CRD number for Williams Financial is inexplicably missing from their CRD reports; or (2) Gulis and Peterson, whose employment with Williams Financial did not consume the ten-year period preceding September 2004, did not list Williams Financial as their member firm when registering with NASD.  *See supra* note 14. The Court cannot determine which inference is correct.

Tong argues that Gulis's and Peterson's employment by Williams Financial required registration with NASD pursuant to NASD Manual Rule 1031, which provides that "[a]ll persons engaged or to be engaged in the investment banking or securities business of a member who are to function as representatives shall be registered as such with NASD in the category of registration appropriate to the function to be performed."  Tong misses an important step, however, because there is no evidence before the Court, or at least no evidence to which the Court was directed, stating what positions Gulis and Peterson held with Williams Financial.  Without such

---

[12] As previously stated, CRD reports list a broker's current and former employers and only provide a CRD number for current employers (or firms) registered with the NASD.  (Pl.'s App. to Reply Br. at 32-33 (Gulis's CRD Report.))  CRD numbers are not displayed for firms that are either not registered with the NASD or that are registered with the NASD but no longer employ the broker in question.  (*Id.*)

evidence, the Court cannot conclude that Gulis and Peterson "engage[d] in the investment banking or securities business of a member" while employed by Williams Financial. While logic suggests that Gulis and Peterson acted in such a capacity, without some evidence indicating as much the Court cannot draw such an inference. The Court therefore cannot assume that Rule 1031 applied to Gulis's and Peterson's association with Williams Financial.

Moreover, even were Rule 1031 applicable, the Court could not further infer that Gulis, Peterson, and Williams Financial actually complied with Rule 1031. It is an understood reality that individuals and entities do not always fully comply with every rule and law to which they are subject; the Court cannot ignore this reality without some evidence indicating that compliance with Rule 1031 was required and did occur. Thus, whether Gulis and Peterson registered with NASD and listed Williams Financial as their member firm cannot be determined from the evidence.

The record therefore demonstrates only that Tong was registered with NASD through Williams Financial during the time relevant to the present dispute, that Gulis and Peterson are currently registered with NASD through DTI, that DTI is a current NASD member, and that Williams Financial was a NASD member during the relevant time. Since Tong, Gulis, Peterson, DTI, and Williams Financial are or were all registered with NASD, they are all

15

parties to the membership agreement and are subject to the Code's provisions. *See Gilmer*, 500 U.S. at 25; *Muh*, 540 F.2d at 973; *Willis*, 948 F.2d at 305; *Goldberg*, 650 F. Supp. at 225-26; *Basil*, 1998 U.S. Dist. LEXIS 2220, at *7-8; *Hickman*, 1996 U.S. Dist. LEXIS 13196, at *7-8.   Gulis, Peterson, and DTI have therefore entered into an agreement to arbitrate.   Whether they entered into an agreement to arbitrate the present matter is a separate question.

C.   Application of the Code[13]

   (a)   Legal Standards

   Section 1 of the Code, contained within Rule 10101, "defines the general universe of issues that may be arbitrated," *Thomas James Assocs. v. Jameson*, 102 F.3d 60, 64 (2d Cir. 1986) (citing *Armijo*, 72 F.3d at 798), and provides

---

[13] The Court notes that the *interpretation* of the scope of the Code's provisions, once it is established that an agreement to arbitrate exists, is within the sound province of the FAA and its policy favoring arbitration. *See Howsam*, 537 U.S. at 83; *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 798 (10th Cir. 1995).   That policy is not yet applicable.   Although the Court has determined that Gulis, Peterson, and DTI are parties to the membership agreement, and thereby are subject to the Code's arbitration provisions, the Court has still not determined whether the defendants agreed to arbitrate the present dispute. *See Volt*, 489 U.S. at 478 ("The FAA does not require parties to arbitrate when they have not agreed to do so."); *EEOC v. Waffle House*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994) ("The federal policy [favoring arbitration], however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear.") (cited in *Fleetwood*, 280 F.3d at 1073-74); *Mitsubishi Motors*, 473 U.S. at 625-26 (citation omitted) ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered.");   *BMA Fin. Servs. v. Guin*, 164 F. Supp. 2d 813, 817-822 (W.D. La. 2001).   Only when the Court concludes that the defendants entered into such an agreement is the instant matter subject to the FAA's policy favoring arbitration.   *Herrin*, 379 F.3d at 316 n.6; *see also supra* note 7; *BMA*, 164 F. Supp. 2d at 818.

16

for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(a)   between or among members;

(b)   between or among members and associated persons;

(c)   between or among members or associated persons and public customers, or others; and

(d)   between or among members, registered clearing agencies with which [NASD] has entered into an agreement to utilize [NASD]'s arbitration facilities and procedures, and participants, pledges, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

NASD Manual Rule 10101 (2005).[14]

Industry disputes such as the instant one are governed by Section 8 of the Code, or Rule 10201, which addresses what disputes are required to be arbitrated. Only a subset of the disputes eligible for arbitration under Rule 10101 fall within the mandatory arbitration provisions of Rule 10201. *See Armijo*, 72 F.3d at 798; *see also Thomas*, 102 F.3d at 64. Rule 10201(a) provides:

Except as provided in paragraph (b) or Rule 10216, a dispute, claim, or controversy eligible for submission

---

[14] At the time of this order's issuance, NASD rules and the Code's provisions were available at NASD's website, located at <http://www.nasd.com>. The Code's provisions were specifically available at <http://www.nasd.com/web/groups/med_arb/documents/mediation_arbitration/nasdw_013098.pdf>.

under the Rule 10100 Series between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:

> (1) a member against another member;

> (2) a member against a person associated with a member or a person associated with a member against a member; and

> (3) a person associated with a member against a person associated with a member.

NASD Manual Rule 10201 (2005).

Thus, under the Code, three conditions must be met for an industry dispute to be subject to mandatory arbitration. First, the dispute must qualify as arbitrable under Rule 10101. *See* NASD Rule 10201(a);[15] *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("In order to satisfy both Rules 10101 and 10201, and thus be subject to mandatory arbitration, plaintiffs' . . . claims must be 'between' persons specifically listed in Rule 10101") (citing *First Liberty Inv. Group v. Nicholsberg*, 145 F.3d 647, 651 (3d Cir. 1998)). Second, the matter must fall within the party and subject-

---

[15] Rule 10201(a) specifically provides that, save the applicability of certain exceptions, "a dispute, claim, or controversy eligible for submission under the Rule 10100 Series . . . shall be arbitrated under this Code." Thus, the rule's language only requires mandatory arbitration where a dispute, claim, or controversy is first eligible for submission to arbitration pursuant to Rule 10101.

matter restrictions contained within Rule 10201(a):

> The first . . . restriction [is] on the parties: the dispute must be between or among members and/or associated persons, and/or certain others.  The second . . . restriction [is] on subject matter: the substantive dispute must be one arising in connection with the business of members or arising in connection with the activities of such associated person(s).

*Heller v. MC Fin. Servs.*, 97 Civ. 5317 (WK), 1998 U.S. Dist. LEXIS 5547, at *5-6 (S.D.N.Y. Apr. 21, 1998) (citing *McMahan Securities v. Forum Capital Markets*, 35 F.3d 82, 86 (2d Cir. 1994)).  *See also* NASD Manual Rule 10201(a); *First Liberty*, 145 F.3d at 651; *Westervelt v. Bayou Mgmt., L.L.C.*, CIVIL ACTION NO. 03-0860, 2003 U.S. Dist. LEXIS 20082, at *6 (E.D. La. Nov. 4, 2003).  Third, the dispute must be instigated by either an NASD member or an associated person.  *See* NASD Manual Rule 10201(a); *World Fin. Group Inc., v. Steele*, CAUSE NO. IP 02-248-C H/ K, 2002 U.S. Dist. LEXIS 17376, at *11 (S.D. Ind. Aug. 15, 2002).  A party's status as a member or associated person "must be determined at the time of the events giving rise to the dispute or claim." *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1288 (11th Cir. 2002).[16]

---

[16] The Court notes that parties qualifying as "certain others" under Rule 10201 may not compel arbitration under the Code. *See Westervelt*, 2003 U.S. Dist. LEXIS 20082, at *7; *Burns v. New York Life Ins. Co.*, 202 F.3d 616, 621 (2d Cir. 2000) (holding that "certain others" may join in NASD arbitration but may not compel such arbitration); *World Group Secs v. Ko*, No. C-03-5055 MJJ (EDL), 2004 U.S. Dist. LEXIS 15726, at *19 (N.D. Cal. Feb. 11, 2004) (same); *Steele*, 2002 U.S. Dist. LEXIS 17376, at *11.  In some circumstances, however, "certain others" may be compelled to arbitrate. *See Westervelt,* 2003 U.S. Dist. LEXIS 20082, at *7-8; *Cantor Fitzgerald*, 731 A.2d at 827; *McMahan*, 35 F.3d at 88; *Basil*, 1998 U.S. Dist. LEXIS 2220, at *10-11.

(b)   The Defendants and Rule 10101

Applying Rule 10101, it's clear that, since Tong is an associated person, the only provisions that arguably may apply here are (b) and (c).   The term "associated person," found in Rule 10101, includes "a natural person registered under NASD rules." NASD Manual Rule 1011, *at* http://nasd.complinet.com/nasd/display/display.html?rbid=1189&element_id=1159000411. Though the definition itself does not indicate as much, it appears that the term "person associated with a member," as used in Rule 10201, encompasses the same definition. *See Gates*, 2004 U.S. Dist. LEXIS 10104, at *14 (citing NASD By-Laws, Art. I., P (q)); *Paul Revere Variable Annuity*, 226 F.3d at 19 (older NASD rules) (citing NASD By-Laws, Art. I).   "Associated persons" or "persons associated with a member" must be natural persons; corporate entities cannot be so classified.   *Tays v. Covenant Life Ins. Co.*, 964 F.2d 501, 503 (5th Cir. 1992).

The U-4 establishes that Tong was an associated person of Williams Financial at the time relevant to the present dispute: Tong is a natural person who was registered with NASD through Williams Financial at the time that her dispute with the defendants arose.   *See Riccard*, 307 F.3d at 1288.   But Tong does not assert claims against Williams Financial.   Instead, her claims are against

Gulis, Peterson, and the DT entities.

Gulis and Peterson are currently associated persons of DTI: they are both natural persons and, as of September 2004, were both registered with NASD. (Pl.'s App. to Reply Br. at 32, 33, 45, 47 (CRD Reports)).  While Gulis's and Peterson's current firm is DTI, they were previously employed by Williams Financial.  As previously discussed, the only proof that Gulis and Peterson may be or were associated persons of Williams Financial is that they formerly worked for Williams Financial.  There is no evidence in the record that Gulis and Peterson were associated persons of either DTI or Williams Financial at the time relevant to the present dispute. Nor is there any evidence that any of the DT entities were NASD members at that time.  The facts of this case therefore present a complicated, and from what the Court can determine a previously unexamined, scenario in which an associated-person plaintiff of one member seeks to compel arbitration against a different member and other registered defendants where the defendants' statuses as NASD members or registrants during the relevant period are unknown and where the relationships between the defendants and the member for whom the plaintiff registered is not entirely discernible.

Rule 10101 provides "for the arbitration of any dispute, claim, or controversy . . . *arising out of the employment or termination of employment of associated person(s) with any member.*" NASD Manual Rule 10101 (2005) (emphasis added).  This language

21

implies that, to be arbitrable, a dispute must (1) arise from an associated person's employment with or termination from the member with whom they were associated; and (2) be between that person and that member. *See BMA*, 164 F.Supp.2d at 819 (evaluating whether any person buying goods or services should be given "customer" status pursuant to Rule 10301 without being required to show that the relevant purchase was from the member defendant or its associated person). As already examined by at least one court within the Fifth Circuit, a contrary reading would leave NASD members vulnerable to rampant litigation premised upon claims those members likely did not anticipate they were agreeing to arbitrate. *See id.* It would be tantamount to a holding that any NASD member or associated person could demand arbitration against another member or associated person regardless of whether an actual NASD relationship existed between the two. *See id.* In other words, simply by becoming a NASD member or by registering with NASD, a firm or individual would agree to arbitrate the claims of any person with whom they dealt, regardless of whether that individual was actually associated with the member defendant or its associated persons. *See id.* Such a boundless definition is not only unsupported by the language of Rule 10101 itself, but also would surely upset the reasonable expectations of NASD members and their associated persons in entering into the membership agreement. *See id.* The Court cannot give credence to such a reading.

22

The defendants' requirements to arbitrate are contained in Rule 10101. Since Tong's claims are not against the member with whom she was associated--Williams Financial--or that member's associated person(s), Tong's claims are not within the bounds of Rule 10101, the arbitration requirement consented to by the defendants. The defendants have therefore not agreed to arbitrate those claims and are not parties to an arbitration agreement with Tong. *See Volt*, 489 U.S. at 478 ("The FAA does not require parties to arbitrate when they have not agreed to do so.").

Moreover, there is no evidence in the record that any of the defendants were registered with NASD at the time that the present dispute arose. Such evidence is crucial for Tong's motion to compel arbitration because "the status of association with a member must be determined at the time of the events giving rise to the dispute or claim." *Riccard*, 307 F.3d at 1288. Thus, for the defendants to be parties to the membership agreement upon which Tong moves to compel arbitration, they must have been parties to that agreement at the time that Tong's claims arose. There is no such evidence before the Court. The only evidence before the Court demonstrates that DTI, Gulis, and Peterson are *presently* registered with NASD. Such a showing is insufficient, and the Court can only conclude that DTI, Gulis, and Peterson were not parties to the Code at the necessary time. Thus, even assuming that the Court's reading of Rule 10101 is too restrictive, Tong still would not be

23

entitled to compel arbitration of the instant matter because there is no evidence of a timely agreement to arbitrate by the defendants. *Id.; see also Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820-821 (11th Cir. 1993).

The Court therefore concludes that the defendants did not agree to arbitrate the present dispute. Tong's claims are simply too far outside the bounds of Rule 10101 for arbitration to be considered within the scope of the defendants' agreement to arbitrate. Moreover, Tong has not adduced any evidence that the defendants were subject to the Code's provisions when the present dispute arose.

Furthermore, the defendants specifically aver that they did not sign any document containing an arbitration clause. (Defs.' Resp. to Pl.'s Additional Br. at 5). In the face of such statements, and without any proof to the contrary, the Court cannot conclude that the defendants actually entered into an arbitration agreement. Without an agreement to arbitrate, the Court cannot compel arbitration. *AT&T Technologies*, 475 U.S. at 648 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (citation omitted); *Steelworkers*, 363 U.S.at 582; *Howsam*, 537 U.S. at 83; *Gross*, 1998 U.S. Dist. LEXIS 20911, at *6-7 ("The duty to arbitrate remains one of contract; a court will not compel parties to arbitrate a dispute unless the parties agreed

24

to do so.") (interpreting U-4 form) (citation omitted).[17]   Thus,

Tong's motion to compel arbitration must be denied.[18]


### III. CONCLUSION

Therefore, Tong's Motion to Compel Arbitration [doc. # 78-1]
is DENIED.

Further, Tong's Motion to Stay Proceedings [doc. # 78-2] and
the defendants' First Amended Motion for Preliminary Injunction
[doc. # 164] are RENDERED MOOT.

SIGNED September 19, 2005.


_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/kat

---

[17] The Court need not examine the defendants' waiver arguments because it
has already concluded that the defendants are not parties to the arbitration
agreement at issue.

[18] Because the Court concludes that Tong's motion to compel arbitration
must be denied, the defendants' motion to enjoin the arbitration proceedings
before NASD is rendered moot.